ROBERT H. RANDALL & others *vs.* ADAMS D. CLAFLIN.

Suffolk.	January 9, 1907. — March 1, 1907.

Present: KNOWLTON, C. J., MORTON, LORING, BRALEY, & SHELDON, JJ.

*Contract*, Performance and breach. *Option. Evidence.*

In an action for the alleged breach of a contract in writing to purchase at an agreed price one fourth of the capital stock of a corporation formed to utilize an invention of a machine for cutting cloth in case a certain lawyer should give an opinion that the invention was patentable, it appeared that the lawyer named gave an opinion in writing in substance to the effect that the invention was a new one but that whether it was patentable or not depended upon the practical question to be determined by experts whether the device was an important one for use in cloth cutting machines. *Held*, that this was not an opinion that the invention was patentable and that the defendant was not bound to purchase the stock.

In an action for the alleged breach of a contract in writing under seal to purchase at an agreed price one fourth of the capital stock of a corporation which the plaintiffs were about to form to utilize an invention of a machine owned by them in case a certain lawyer should give an opinion that the invention was patentable, and providing further that, if the lawyer should give an

opinion that the invention was not patentable, the defendant should have an option to take and pay for the stock, and that the defendant should determine whether he would or would not purchase the stock as soon as the opinion of the lawyer was received, provided the opinion was unfavorable, it appeared that the corporation was formed in the manner contemplated and represented all the interest of the plaintiffs in the invention, that before the opinion of the lawyer was given there was in the stock book of the corporation an unissued certificate for one quarter of the shares of the capital stock of the corporation made out in the name of the defendant, that the lawyer gave an opinion which was not an opinion that the invention was patentable, that thereupon the defendant told one of the directors of the corporation, who was the son of the treasurer of the corporation, that he had decided not to go on with the contract, that the son of the treasurer narrated this conversation to the treasurer, who was one of the parties to the contract, that the defendant himself afterwards stated his decision to the treasurer, that thereupon the treasurer had the defendant sign an indorsement on the back of the unissued certificate in the stock book which had been made out in his name, that thereafter the shares were treated as stock in the treasury of the corporation, and that for eight years the plaintiffs, although seeing the defendant frequently, never questioned his determination or suggested that he was liable under the contract. *Held,* that the defendant was not required by the contract to give formal notice to the plaintiffs either in writing or orally of his determination not to purchase the stock, and that his indorsing the certificate, thereby relinquishing his right to the stock, was an overt act sufficiently communicating such determination. *Held, also,* that the conversation between the defendant and the son of the treasurer, afterwards communicated to the treasurer, in which the defendant told the son of his decision not to go on with the contract was admissible in evidence against the plaintiffs.

Where a letter of a deceased person contains statements which under R. L c. 175, § 66, are admissible in evidence for the purpose of contradicting the material testimony of a witness, the fact that the letter also contains irrelevant matter does not make the relevant portion of it inadmissible.

CONTRACT to recover damages for the alleged breach of a contract in writing in refusing to purchase from the plaintiffs one quarter of the capital stock of the National Cloth Cutter Company. Writ in the Supreme Judicial Court dated January 3, 1905.

The contract declared upon was as follows:

" Agreement between Adams D. Claflin, party of the first part, and Robert H. Randall, Calvin E. Randall, Preston C. Morse and William L. Coolidge, parties of the second part, Witnesseth:

" Whereas, the parties of the second part are the owners of a certain invention, relative to the cutting of cloth, under an agreement, to which reference is hereby made and

" Whereas, they have agreed to contribute a one-quarter part

of the stock of the corporation, hereafter to be formed, for the purpose of providing funds in the treasury of said corporation; and

" Whereas, said Adams D. Claflin desires to purchase a one-quarter interest, provided the firm of Fish, Richardson & Storrow shall advise that the said invention is patentable:

" Now Therefore,

" 1. Said Claflin hereby agrees to pay into the treasury of said corporation, as soon as the same is formed, the sum of one thousand ($1,000.) dollars.

" 2. In case said Fish, Richardson & Storrow shall give an opinion that said invention is patentable, said Claflin agrees to pay into the treasury of said corporation the further sum of eleven thousand, five hundred ($11,500.) dollars, as soon as said opinion is given; said payment of eleven thousand, five hundred ($11,500.) dollars may be made in installments upon the written consent of all the parties hereto.

" 3. In case said Fish, Richardson & Storrow give an opinion that said invention is patentable, said Randall, Randall, Morse and Coolidge hereby agree to deliver to said Claflin, as soon as said Claflin shall have paid into the treasury of said corporation said sum of eleven thousand, five hundred ($11,500.) dollars, each one-sixteenth part of the entire capital stock of said corporation.

" 4. In case said Fish, Richardson & Storrow give an opinion that the invention is not patentable, said Claflin may, at his option, pay into the treasury of said corporation the said sum of eleven thousand, five hundred ($11,500.) dollars, in which case said Randall, Randall, Morse and Coolidge shall each deliver to said Claflin, upon payment thereof, one sixteenth part of the entire capital stock. Said Claflin shall determine whether he will or will not purchase said stock as soon as the opinion of Fish, Richardson & Storrow is received, provided the opinion is unfavorable.

" 5. In case the opinion of Fish, Richardson & Storrow is to the effect that said invention is not patentable, and said Claflin decides not to purchase the said stock, the said sum of one thousand ($1,000.) dollars shall become the property of said corpora-tion, and said Claflin shall have no further interest therein.

" This agreement shall be binding upon the parties hereto and upon their respective heirs, administrators and assigns.

" Witness our hands and seals this third day of February, A. D. 1896."

Here followed the signatures and the seals of the parties.

The case was tried before *Barker*, J., and the following facts, among others, appeared in evidence:

On February 14, 1896, the corporation referred to in the contract was organized under the laws of the State of Maine, under the name of " National Cloth Cutter Company," with a capital stock of $200,000, consisting of four thousand shares of the par value of $50 each.

On March 4, 1896, the plaintiff Morse filed an application for a patent on his cloth cutting machine, and on March 24, 1896, he assigned his rights under this application to the National Cloth Cutter Company, requesting that the patent issue in the name of the company. This patent was issued on June 29, 1897, and comprised the same claims discussed in the opinion of Messrs. Fish, Richardson and Storrow hereafter referred to.

On March 5, 1896, the defendant paid $1,000 into the treasury of the National Cloth Cutter Company, in pursuance of the contract.

On March 14, 1896, the defendant was elected president of the National Cloth Cutter Company, W. L. Coolidge, W. H. Coolidge, O. H. Durrell and the defendant were chosen directors, and W. L. Coolidge was chosen treasurer. Each of these had subscribed for one share of stock on February 14, when the company was organized.

Certificate No. 9, made out in the name of Adams D. Claflin for nine hundred and ninety-nine shares, was signed by the defendant Claflin as president and by W. L. Coolidge as treasurer, under date of March 14, 1896, but never was torn from the stock book stub, nor was it ever delivered to the defendant, nor did he ever sign any receipt for it.

On August 1, 1896, an application was made for a patent on improvements in the machine by the plaintiffs Morse and Calvin E. Randall. They assigned their rights under this application to the National Cloth Cutter Company on August 21, 1896, and a patent was issued on this application on June 15, 1897.

The opinion of Messrs. Fish, Richardson and Storrow, called for by the contract, was rendered on or about February 2, 1897. The opinion consisted of a letter signed "Frederick P. Fish," addressed to W. H. Coolidge and dated February 2, 1897. The substance of this letter is described in the opinion of the court.

Directly after receiving the opinion of Mr. Fish, W. H. Coolidge handed it to the defendant, who kept it two or three days and went over it carefully by himself, and also spent one evening upon it with W. H. Coolidge. The defendant contended that the opinion was not such an opinion as would compel him to go ahead and make further payment under the contract, and that at that time he decided he would not go ahead, and that this decision was communicated to W. L. Coolidge by W. H. Coolidge, and shortly afterwards by the defendant to W. L. Coolidge.

About February 17, 1897, the defendant and W. L. Coolidge talked over the defendant's relation to the company, in view of the fact that an annual meeting was soon to take place, and it was understood between them that the defendant should drop out as an officer of the company. At the request of W. L. Coolidge the defendant indorsed on the back certificate No. 9, for nine hundred and ninety-nine shares, under date of February 19, 1897.

On February 24, 1897, W. L. Coolidge wrote to C. A. Hight, the clerk of the corporation in Portland, a letter in which he said: " Enclosed find my proxy and I expect to send you more to-morrow or next day. Mr. Claflin has given up all but one of his shares so he will not send proxies. The 999 shares which Mr. Claflin had have not been issued to any other person as yet."

At the annual meeting held on February 27, 1897, Messrs. W. L. Coolidge, W. H. Coolidge and O. H. Durrell were elected directors, and W. L. Coolidge was elected president and treasurer of the company.

About a week after this annual meeting, on March 4, 1897, W. L. Coolidge and the plaintiffs signed a paper as follows:

" Natick, March 4, 1897.

" We, the undersigned, owners of 250 shares each of the National Cloth Cutter Company, which shares have stood on the books of said Company in the name of Adams D. Claflin,

hereby agree that said stock shall become treasury stock to be used for the benefit of said Company.

"W. L. Coolidge, Preston C. Morse, R. H. Randall,
C. E. Randall."

This paper was in the handwriting of W. L. Coolidge. About a year after his death, which occurred on March 4, 1904, the original stock book of the company was found in the office of W. H. Coolidge, and the foregoing paper was found in it pinned to certificate No. 9, for nine hundred and ninety-nine shares in the name of the defendant. The certificate never had been detached from the stock book and was not receipted for, but bore upon the back an assignment running to the treasurer of the National Cloth Cutter Company signed by the defendant under date of February 19, 1897, and witnessed by W. L. Coolidge. This stock book was put in evidence.

The defendant testified in his own behalf. On his direct examination he was asked the following question: "You say you had this conversation with Mr. W. H. Coolidge and went over this contract carefully: will you state what you said to Mr. Coolidge in regard to it?" This question was objected to by the plaintiffs, and was allowed by the justice subject to the plaintiffs' exception. The defendant answered as follows: "I stated to Mr. W. H. Coolidge that in view of the uncertainty or indecisiveness of the opinion, and the many questions and possibilities raised by the opinion, I didn't consider that it met the requirements of the contract, or met my requirements in satisfying me as to the status of the patents and I therefore should not be able to go on, didn't feel able to go on, under the contract, and that I should expect to forfeit my $1,000 already paid in as called for by the contract and cease my connection with the matter."

The witness went on to testify in substance as follows: "After my conversation with Mr. W. H. Coolidge, I met Mr. W. L. Coolidge in the Boston office of Strout and Coolidge and confirmed to him what I had stated to Mr. W. H. Coolidge. W. L. Coolidge made no comment on my statement other than shaking his head up and down. I understood him to acquiesce in my decision. I saw Mr. W. L. Coolidge after that almost every day for a long time; from that time on Mr. W. L. Coolidge

made no demands on me in connection with this contract or its performance; he never alluded to the matter thereafter."

W. H. Coolidge, who was called as a witness by the defendant, having testified that after the opinion of Fish, Richardson and Storrow was given he had a conversation with the defendant in regard to it, was asked on his direct examination the question "What did he say?" This question was objected to by the plaintiffs and was admitted by the presiding justice. "A. I can't remember the language; I know the substance of it. — Q. State, as near as you can, the substance. A. The substance was that this wasn't the kind of a report he was going in on; that this wasn't the kind he expected to go in on; that there were questions in regard to whether it would infringe some old patent; there were questions in regard to how much value it was, whether it was useful, and how easily it might be got around; and that on the whole he didn't think he ought to go in."

The witness testified that after having this conversation with the defendant he told his father all about it; told him that the defendant and he had had a talk, and what the defendant said and what the witness said.

The defendant was recalled, and stated in regard to signing his name on the back of certificate No. 9 on February 19, 1897, that he remembered that after talking with W. H. Coolidge and subsequently with W. L. Coolidge, W. L. Coolidge and the witness talked over the witness' relation as an officer of the company, in view of the fact that an annual meeting was pretty soon to take place, and it was understood between them that of course the witness should drop out as a director and officer of the company at that annual meeting, as the witness' connection with the company was to be entirely severed owing to his not taking the option under the contract. As nearly as the witness could fix that conversation it must have been somewhere in the latter part of February. It was as a result of that conversation that the witness signed the transfer on the certificate, and he did not send a proxy to the meeting, as he was not supposed to have any further connection with the stock.

The defendant then offered the following letter, signed by O. H. Durrell previously mentioned, who died three or four

years before the trial, which was admitted subject to the plaintiffs' objection and exception :

"Boston, March 6, 1897.

"W. H. Coolidge, Esq.,

"Dear Mr. Coolidge : — I had a talk with your father to-day regarding the company. The question arose about the amount due Raymond, namely, $150.50, whether any portion of it is to be assumed by you; and then regarding the bill of Mr. Fish of $417. whether that would be assumed by Mr. Claflin or the company. From the fact that Mr. Claflin has forfeited his $1000., it seems to me that this ought to be a bill for the company to pay. Would you kindly let me know when the note for $1200. given J. C. Cushing, matures?

"Mr. Randall told me that your father suggested giving Mr. Claflin 80 shares of stock from the treasury. It seems to me, however, that as Mr. Claflin of his own volition did not see fit to buy the quarter interest, that we ought not to give him any shares of the treasury stock.

"I will do all I can to make the company a success. As soon as Mr. Winslow decides will you let me know, for if he thinks it better not to have anything to do with it, we will look elsewhere.

"With regards,

"Yours truly,

O. H. Durrell."

At the close of the evidence the plaintiffs asked the justice to make the following rulings :

"1. Upon all the evidence in the case, as a matter of law, the plaintiffs are entitled to recover.

"2. Upon all the evidence in the case, as a matter of law, the letter of Frederick P. Fish, Esq., to William H. Coolidge, dated February 2, 1897, was an opinion that the invention referred to in the contract in suit was patentable.

"3. If the jury find that the scissors cut in the Morse machine is a substantial advantage in the machine, and an advance in the art, then the opinion rendered by Mr. Fish would be an opinion that this invention was patentable, and the plaintiffs are entitled to recover upon proof of the other allegations of their declaration."

The justice refused to make any of these rulings, and instructed the jury that the opinion given by Fish, Richardson and Storrow was not such an opinion as required the defendant to make his payment of $11,500 into the treasury of the company, giving also, among other instructions, those which are quoted and described in the opinion of the court. The jury returned a verdict for the defendant; and the plaintiffs alleged exceptions, which after the death of *Barker*, J. were allowed under R. L. c. 173, § 108, by *Morton*, J.

*W. R. Bigelow*, for the plaintiffs.

*C. A. Hight*, ( *G. S. Selfridge* with him,) for the defendant.

KNOWLTON, C. J.    This is an action upon a contract in writing, whereby the defendant agreed with the plaintiffs and one William L. Coolidge, who were the owners of an invention and of the capital stock of a corporation formed for the purpose of utilizing the invention, to pay $11,500 and receive one fourth of the capital stock of the corporation in case Fish, Richardson and Storrow should give an opinion that the invention was patentable. Under the contract the defendant also had an option to pay the money and take the stock if Fish, Richardson and Storrow should give an opinion that the invention was not patentable, and in reference to that the language of the contract is as follows: " Said Claflin shall determine whether he will or will not purchase said stock as soon as the opinion of Fish, Richardson and Storrow is received, provided the opinion is unfavorable."

The first question which arises is whether they gave an opinion that the invention was patentable. As to this the presiding justice instructed the jury as follows: " It is not a question whether the invention is patentable or not, but whether Messrs. Fish, Richardson and Storrow will say that it is in terms; and what they say, in substance, about it, as I construe it, is that this is a new invention, but that whether it is patentable or not depends upon certain practical things, the value of certain practical things, which they know nothing about; and if they are sufficiently valuable then it is patentable, and if not, then it is not. So they do not give, it seems to me, an opinion that the invention is patentable." There is little to be added to this brief characterization of the opinion given by Fish, Richardson and

Storrow. An examination of it will show that, while the writer of it found in the invention much to commend, he carefully refrained from giving an opinion upon certain questions which he stated, and which should be answered affirmatively in order to render the invention patentable. He made the patentability of the invention depend on whether "such a 'scissors' cut . . . is a substantial advance in the art." He then said, "It is a practical question to be determined by mechanical experts as to whether or not there is in this class of machines such a decided advantage in a 'scissors' cut. I myself express no opinion on that point, for it is outside of my province." He stated as his conclusion "that if, as a matter of fact, the peculiar arrangement and combination of the cutting blades of the Morse machine is very important in cloth cutters, the first nine claims are of corresponding importance and would protect the manufacturer of the Morse machine against the competition of other machines having this peculiar cutting organization. If a reciprocating cutter having a long plunging stroke and toward the end of its stroke cooperating with a stationary blade to make a 'scissors' cut is not important, then the claims are not important."

We are of opinion that this instruction of the justice was correct, and we thus dispose of the plaintiffs' three requests for rulings, and of their exceptions to the rulings given on this part of the case.

The next question is whether there was error in the instructions in regard to the defendant's determining whether he would or would not purchase stock. The jury were instructed that there was nothing in the contract that required him to give notice to anybody whether he made that determination or not, and that "it is not necessary that he should give an explicit notice, either in writing or orally, either to all of the signers or to any of them. It is necessary that, in addition to making the decision in his own mind, he should do something so that that might become properly known, and so that thereafter he could not dispute but that he had made that decision." He further told the jury that, if, deeming the opinion unfavorable, he decided in his own mind that he would not go on, and "if, having come to that determination in his own mind, he did communicate that to Mr. W. H. Coolidge, and it came to the knowledge of Mr.

W. L. Coolidge, who was treasurer at that time of the corporation, and thereupon, having that knowledge, Mr. W. L. Coolidge, the treasurer, had him sign the assignment on the back of the certificate in the book, and that was considered between them as an act which he had done in relinquishing his right to the stock, that would be such an overt act as would be a sufficient communication of his determination." This had reference to an assignment of one fourth of the capital stock of the corporation, for which there was an unissued certificate in the stock book standing in his name, and which he indorsed over for use by the corporation soon after the receipt of the opinion from Fish, Richardson and Storrow. This is to be taken in connection with the undisputed evidence that, long before that time, a corporation had been formed by the plaintiffs and their associate W. L. Coolidge, with whom the defendant contracted; that this corporation represented all the interest of the plaintiffs in the invention; that W. H. Coolidge, a son of W. L. Coolidge, who had acquired a half interest in his father's stock, was one of the directors, who acted for himself and others in the business, and to whom the opinion of Fish, Richardson and Storrow was given, and with much other evidence from which it ought to be inferred that all the plaintiffs very early had knowledge of the defendant's determination not to purchase the stock. We are of opinion that the justice was right in ruling that no formal notice to the plaintiffs was necessary, and that it was enough if the defendant promptly came to the determination, and did some overt act which would bind him so that it might become properly known. There was uncontradicted evidence that the plaintiffs went on without him, for nearly eight years, and that, although seeing him frequently, no one of them ever questioned his determination or suggested that he was liable under the contract.

The conversation with W. H. Coolidge was competent. He was acting in the interest of himself and the plaintiffs in procuring the opinion, and he was one of the directors of the corporation. He narrated the conversation to his father, W. L Coolidge, another of the directors and the treasurer of the corporation, and one of the joint signers with the plaintiffs of the contract on which this action is brought.

The letter from Durrell to W. H. Coolidge was competent. It was the declaration of a deceased person, and it tended to contradict material testimony of R. H. Randall, one of the plaintiffs. That it contained irrelevant matter does not render the whole letter inadmissible.

*Exceptions overruled.*